UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * * *

The Minnesota School Board Association Insurance Trust, and Independent School District 94 - Cloquet,

Plaintiffs,

vs. REPORT AND RECOMMENDATION

The United States Equal Employment Opportunity Commission, Education Minnesota, and Education Minnesota - Cloquet,

Defendants. Civ. No. 00-2042 (RHK/RLE)

* * * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 15th day of August, 2001.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Plaintiffs' Motion for Partial Summary Judgment, and for Injunctive Relief; upon the Defendant Equal Employment Opportunity Commission's ("EEOC's") Motion to Dismiss; and upon the Defendants Education Minnesota's, and Education Minnesota-Cloquet's (collectively, "Unions'"), Motion to Dismiss. A Hearing on the Motions was conducted on March 22, 2001, at which time, the Plaintiffs appeared by

FILED AUG 15 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

Shamus P. O'Meara, and Mark R. Azman, Esqs.; the Defendant EEOC appeared by Maria Luisa Morocco, Esq.; and the Defendant Unions appeared by Laurie A. Knocke and Harley Ogata, Esqs.

For reasons which follow, we recommend that the Plaintiffs' Motion for Partial Summary Judgment, and for Injunctive Relief, be denied, as moot. We further recommend that the Motions to Dismiss, of the EEOC, and of the Unions, be granted.

## II. Factual and Procedural History

The Plaintiffs in this case, the Minnesota School Boards Association Insurance Trust ("MSBAIT"),[1] and Independent School District 94-Cloquet ("ISD 94"), brought this suit because of actions taken by the EEOC. According to the Plaintiffs, over the past

---

[1]MSBAIT is a voluntary, non-profit organization which was established, by the Minnesota School Boards Association, pursuant to statutory authority. See, Affidavit of Richard Anderson, at ¶3. MSBAIT is authorized by Minnesota law to engage in self-insurance on behalf of its member school districts. A vast majority of the Minnesota school districts, though not all, are members of MSBAIT.

MSBAIT's Group Self-Insured Property and Casualty Plan ("Trust Plan") is a self-insuring pool of coverage developed by MSBAIT to provide comprehensive, all-risk protection to Plan Participants for their real and personal property interests. See, Affidavit of John Sylvester, at ¶3. Unlike commercial insurance, the Trust Plan is not a member insurer under the Minnesota Insurance Guarantee Act, and the contributions of the Plan Participants are not based upon loss history. Id. at ¶4. In the even of a loss sustained by a Plan Participant, the funds of all Plan Participants are financially affected because the loss is paid from the Trust Plan where all Plan Participants' contributions are pooled. Id. at ¶6; Affidavit of Richard Anderson, at ¶11.

year, the EEOC has targeted approximately three hundred Minnesota School Districts with age discrimination claims, under the Federal Age Discrimination in Employment Act of 1967 ("ADEA"). See, Title 29 U.S.C. §621 et seq.

Specifically, the EEOC has been investigating the retirement plans, which are employed by the School Districts, through the application of their respective collective bargaining agreements. The EEOC investigates employment discrimination charges and enforces Federal Equal Employment Opportunity statutes, including the ADEA. During the past year, based on the filing of 67 individual charges of discrimination, see, Affidavit of Monty Johnson, at ¶3, and the EEOC's own issuance of directed charges,[2] the EEOC has

---

[2]During June of 2000, the EEOC Milwaukee District Office issued 92 directed ADEA charges to Minnesota School Districts. See, Affidavit of Monty Johnson, at ¶10. It also sent letters to 308 other Minnesota School Districts, requesting that they provide information on their early retirement plans, so as to determine their compliance with the ADEA. Id. at ¶11. As a result of the information received, the EEOC issued another 149 directed charges against Minnesota School Districts. Id. at ¶13. There are a total of 409 School Districts in Minnesota. Id.

As of February of 2001, of the direct charges issued by the EEOC against the Minnesota School Districts, 112 remained open. Id. at ¶14. Of those 112, 87 have been given a "reasonable cause determination" -- that is, a finding has been made that there is reasonable cause to believe that the plan violates the ADEA -- but conciliation efforts have not yet been completed. Id. One hundred and twenty-nine of the directed charges were closed, and all but three had reasonable cause determinations. Id. at ¶15. As for the cases that were closed, and had a reasonable cause determination,
(continued...)

investigated whether the Minnesota Independent School Districts' early retirement plans violate the ADEA.[3] As a result, the EEOC has sent numerous School Districts, and Local Unions, letters of determination, which state that there is reasonable cause to believe that their early retirement plans violate the ADEA.[4] In such instances, the EEOC attempts to engage in conciliations efforts, which are completely voluntary. The EEOC has not filed any enforcement actions in Court, which relate to any of the charges. Id. at ¶18. According to the Plaintiffs, however, a number of Plan

---

[2](...continued)
only twelve have been successfully resolved through conciliation efforts. Id. In addition to the School Districts, the EEOC Milwaukee District Office has filed 121 directed charges against Education Minnesota Locals. Id. at ¶16.

[3]According to the Plaintiffs, the School Districts have used the Minnesota Teacher Early Retirement Incentive Program ("TERIP"), as a guide for their own plans. The TERIP Statute provides a minimum age eligibility requirement for early retirement, and it decreases the amount of benefits, for each year that an individual should work over the age of 55. See, Affidavit of John R. Lowe, at ¶3. This type of plan has been targeted, by the EEOC, as a violation of the ADEA.

[4]Each local School District, and the corresponding Local Union, negotiate their own collective bargaining agreements. See, Affidavit of Larry E. Wicks, at ¶10. Consequently, each collective bargaining agreement is unique. Thus, while many of the collective bargaining agreements, between local School Districts and their Unions, contain early retirement incentive pay provisions, the exact terms of the provisions differ. Id. at ¶17. In its survey of the collective bargaining agreements of the Local Unions, the Defendant Education Minnesota has found approximately 100 different types of clauses which might, under the EEOC's analysis, implicate age discrimination issues under the ADEA. Id. at ¶22.

Participant School Districts have voluntarily agreed, through the EEOC's conciliatory efforts, to settlements.

As noted, the retirement plans at issue are included in a School District's collective bargaining agreement. MSBAIT does not negotiate, or sign the collective bargaining agreements between individual School Districts, and the respective Local Union. Rather, local affiliates, such as the Defendant Education Minnesota-Cloquet, represent the specific School District employees, in collectively bargaining for certain retirement plans, and were the signatories to those plans. See, Affidavit of Larry E. Wicks, at ¶¶9-10. Conversely, the Defendant Education Minnesota is a voluntary organization, whose purpose is to provide a unified voice for educators in Minnesota. Id. at ¶2. Education Minnesota does not engage in collective bargaining, or in grievance processing, and is not a signatory to any collective bargaining agreement with any School District in Minnesota. Id. at ¶7. Education Minnesota's role in collective bargaining, at the local level, is limited to providing advise and consultation to its Local Unions, such as Education Minnesota-Cloquet, which is the Local Union in which teachers in ISD 94 are members. Id. at ¶9. About 350 of the Local Unions belong to Education Minnesota. Id. at 1.

On June 16, 2000, the EEOC filed a Charge of Discrimination against ISD 94, so as to determine its compliance with the ADEA.

See, Exhibit B to Affidavit of Shamus P. O'Meara. ISD 94 filed a response to the Charge, advising the EEOC, among other things, that the purposes behind the voluntary early retirement program were: (1) to lower costs, by replacing high income employees with lower income employees; (2) to retain a mix of age, and experience levels, of teachers within the schools; (3) to avoid a concentration of employees of the same age, and/or length of service, which would cause problems if the District had to replace departing teachers with similarly qualified teachers at one time; (4) to provide incentive to teachers who chose to retire early; and (5) to conform to relevant laws regarding constructive receipt, and age discrimination. See, Exhibit C to Affidavit of Shamus P. O'Meara. ISD 94 further advised, that its early retirement plan was a completely voluntary program which had been adopted at the request of the teachers. Id. On July 21, 2000, the EEOC issued a Determination which found reasonable cause to believe that the District's policy was facially discriminatory. See, Exhibit D to Affidavit of Shamus P. O'Meara.

The Determination indicated that the EEOC was prepared to begin conciliation, and it included a proposed Conciliation Agreement which would require the District to pay all of the employees, who were affected by the allegedly discriminatory policy, double the amount of money lost within a two-year time period prior to the

filing of the Charge. See, Exhibit E to Affidavit of Shamus P. O'Meara. The District's attorney then wrote the EEOC requesting additional information to support the EEOC's Determination. See, Exhibit F to Affidavit of Shamus P. O'Meara. The EEOC subsequently determined that its efforts to "conciliate this charge have been unsuccessful," and asserted that it "will not make further efforts to conciliate this charge." Exhibit G to Affidavit of Shamus P. O'Meara. The EEOC concluded by stating that it would be "forwarding the case for possible litigation." Id.

On August 30, 2000, the Plaintiffs initiated this litigation, pursuant to the Federal Declaratory Judgment Act, Title 28 U.S.C. §2201 et seq., the Administrative Procedure Act, Title 5 U.S.C. §700 et seq., as well as the Constitution of the United States. See, Second Amended Complaint, at ¶1. In their Second Amended Complaint, the Plaintiffs seek declaratory, and injunctive relief, against the EEOC, Education Minnesota, and Education Minnesota-Cloquet, as follows: (1) a declaration that the ADEA is unconstitutional and, therefore, cannot be applied, by the EEOC, against the Plan Participants; (2) a declaration that the Plan Participants are arms of the State of Minnesota, and are, therefore, immune from private suits under the ADEA by virtue of the Eleventh Amendment; (3) a declaration, alternatively, that all of the collective bargaining agreements of the Plan Participants comply with the ADEA;

(4) an order enjoining the EEOC from bringing a lawsuit against any Plan Participant for violation of the ADEA; and, (5) a ruling that the Unions will be bound by the Count's decision. See, Second Amended Complaint, Counts I - V.

The Plaintiffs now move for Partial Summary Judgment, on Counts I and II, of their Second Amended Complaint. The first basis for this Motion is their belief that Supreme Court precedent, with respect to Congress' power under the Fourteenth Amendment,[5]

[5]In particular, the Plaintiffs cite the Supreme Court's recent decision in Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000). In Kimel, the Court was analyzing whether Congress exceeded its authority to abrogate the States' Eleventh Amendment immunity from suit, by private individuals, under the ADEA. The Court stressed that if, in enacting the ADEA, Congress relied solely on Article I of the Constitution -- the Commerce Clause -- private petitioners could not maintain suits against their State employers, as "Congress' powers under Article I of the Constitution do not include the power to subject States to suit at the hands of private individuals." Id. at 79-80. As a consequence, the Court proceeded to analyze the Act under Congress' power under Section 5 of the Fourteenth Amendment.

Applying the pertinent "congruence and proportionality" test, the Court concluded that the ADEA is not "appropriate legislation under §5 of the Fourteenth Amendment." Id. at 81. Specifically, the Court noted that "the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional conduct that conceivably could be targeted by the Act." Id. The Court came to this conclusion after analyzing traditional Equal Protection claims of age discrimination, which require a "rational basis" to be deemed constitutional. In contrast, the ADEA ratchets that standard up and, as a result, "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." Id. at 86. The Court also
(continued...)

and under the Commerce Clause,[6] requires the Court to strike down the ADEA, as applied to the States, as an unconstitutional exercise of authority and, therefore, unenforceable, by the EEOC, against the States. Second, the Plaintiffs contend that the Plan Participants are arms of the State, and are, therefore, entitled to Eleventh Amendment immunity, against private suits for money, under the ADEA. See, Kimel v. Florida Bd. of Regents, 528 U.S. 62 (2000).

On the other hand, the EEOC, and the Unions, have moved to dismiss the Plaintiffs' claims on a number of diverse bases.

---

[5](...continued) noted that the Act's legislative history did not contain any intimation of a widespread problem which would require this remedy. Id. at 89. Thus, on the record before it, the Court held that the ADEA did not abrogate the States' sovereign immunity and, therefore, concluded that private suits for money, against the State, could not be maintained under the ADEA. Here, the Plaintiffs contend that, based on the Supreme Court's reasoning in Kimel, which was, admittedly, directed to private suits, this Court must still declare the act unconstitutional, under the Fourteenth Amendment, as there is no "congruence and proportionality."

[6]In direct contravention of the Plaintiffs' assertion, that the ADEA is an unconstitutional exercise of Congress' power under the Commerce Clause, is the Supreme Court's decision, in EEOC v. Wyoming, 460 U.S. 226 (1983), in which the Court held that the extension of the ADEA, so as to include State and local governments, was a valid exercise of congressional commerce power. The Plaintiffs contend, however, that Wyoming is no longer solid authority, as it was predicated on the three-part test, which was articulated in National League of Cities v. Usery, 426 U.S. 833 (1976), and which was subsequently overruled by Garcia v. San Antonia Metropolitan Transit Auth., 469 U.S. 528, 546-47 (1985).

First, both the EEOC, and the Unions, seek a dismissal of the case under Rule 12(b)(1), Federal Rules of Civil Procedure, for lack of subject matter jurisdiction.[7] Specifically, they contend that the case is not ripe for review, and that the Plaintiffs lack standing. The EEOC further argues that no Federal Statute confers jurisdiction on this Court, and that the case should be dismissed, based upon Rule 12(b)(6), Federal Rules of Civil Procedure, for the failure to state a claim upon which relief can be granted. In addition, the Unions maintain that they are not appropriate Defendants in this action.

II. Discussion

By way of a preface to what follows, we have addressed the Plaintiffs' substantive arguments, largely through our footnotes, in order to provide the reviewing District Court with context for the recommendations we make. Nonetheless, "[w]e have a primordial

[7]To succeed in a Motion to Dismiss for want of subject matter jurisdiction, under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either on its face or on the factual truthfulness of its averments. See, Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge to jurisdiction, "we accept all of the factual allegations in the Complaint as true and ask whether, under those circumstances, [Federal subject matter jurisdiction exists]." See, Deuser v. Vecera, 139 F.3d 1190, 1191 (8th Cir. 1998), quoting Berkovitz v. United States, 486 U.S. 531, 540 (1988). A District Court also has the authority, in a Rule 12(b)(1) Motion which challenges the Court's subject matter jurisdiction, to consider matters outside of the pleadings. Id. at 1191 n. 3, quoting Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 470 (8th Cir. 1993).

duty, in every case before us, to inquire whether the essential prerequisite of subject matter jurisdiction has been satisfied." Maruska v. United States, 77 F. Supp.2d 1035, 1037 (D. Minn. 1999), citing Magee v. Exxon Corp., 135 F.3d 599, 601 (8th Cir. 1998)("Lack of federal subject matter jurisdiction, however, cannot be waived, and we may raise the issue ourselves even if the parties do not."); and Bradley v. American Postal Workers Union, AFL-CIO, 962 F.2d 800, 802 n. 3 (8th Cir. 1992); see also, Rule 12(h)(3), Federal Rules of Civil Procedure ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."). Since the Defendants' Motions to Dismiss go to the threshold issue of our jurisdiction to further hear this matter, we proceed to those Motions first and, because we find those Motions to have merit, we forego further analysis of the Plaintiffs' intriguing substantive claims.

A. Standard of Review. Article III of the United States Constitution restricts Federal Courts to the adjudication of actual "cases" and "controversies." The principle of "ripeness" is among several doctrines -- such as mootness, standing, and the involvement of a political question -- which have developed to inform and define the "case or controversy" requirement. See, Allen v. Wright, 468 U.S. 737, 750 (1984); Neighborhood Transp. Network,

Inc. v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994)("Federal courts are courts of limited jurisdiction and can only hear actual 'cases or controversies' as defined under Article III of the Constitution."). "Its 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" See, Nebraska Public Power Dist. v. Mid-American Energy Co., 234 F.3d 1032, 1037 (8th Cir. 2000), quoting Abbott Labs v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds Califano v. Sanders, 430 U.S. 99, 105 (1977). Thus, before the Court should interpose itself in a dispute, there must be "'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979), quoting Railway Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945).

Although "[t]he difference between an abstract question and a 'case or controversy' is one of degree * * * and is not discernible by any precise test," Babbitt v. United Farm Workers Nat'l Union, supra at 297, the Supreme Court has directed that the determination of whether a case is "ripe," for judicial review, involves two factors: the fitness of the issues involved for judicial resolution, and the hardship to the parties of withholding Court consideration. Abbott Labs. v. Gardner, supra at 149; Pacific Gas & Elec. Co. v.

State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983). As our Court of Appeals has explained:

> The "fitness for judicial decision" inquiry goes to a court's ability to visit an issue. In appeals from administrative regulation, the fitness prong questions finality and exhaustion. See, e.g., Lane v. USDA, 187 F.3d 793, 795 (8th Cir. 1999). More generally, however, it safeguards against judicial review of hypothetical or speculative disagreements. Babbitt [v. United Farm Workers Nat'l Union], 442 U.S. at 297, 99 S.Ct. 2301; State of Missouri ex rel. Missouri Highway & Transp. Comm'n v. Cuffley, 112 F.3d 1332, 1337 (8th Cir. 1997). While courts shy from settling disputes contingent in part on future possibilities, certain cases may warrant review based on their particular disposition. Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 120 S.Ct. 1084, 1093, 146 L.Ed.2d 1 (2000). Exception may be had where an issue is largely legal in nature, Abbott Labs. [v. Gardner], 387 U.S. at 149, 87 S.Ct. 1507, may be resolved without further factual development, Pacific Gas [& Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n], 461 U.S. at 203, 103 S.Ct. 1713, or where judicial resolution will largely settle the parties' dispute, Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 539-40 (1st Cir. 1995). See also [State of Missouri ex rel. Missouri Highway & Transp. Comm'n v.] Cuffley, 112 F.3d at 1333-34, 1337-38 (refusing to address a First Amendment challenge to the Ku Klux Klan's proposed participation in a state highway sponsorship program where the state sought judicial review prior to actually rejecting the Klan's application).

Nebraska Public Power District v. MidAmerican Energy Co., supra at 1038.

The Court went on to explain, with respect to the hardship determination, that "an issue must be such that delayed review will result in significant harm." Id. The Court defined "harm" as including both "the traditional concept of actual damages," as well as "the heightened uncertainty and resulting behavior modification that may result from delayed resolution." Id., citing Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733-34 (1998). Notably, however, the harm must be "significant." Id.

Our Court of Appeals has specifically held that a party seeking judicial relief must satisfy both the "fitness," and the "hardship" prongs, "to at least a minimal degree." Id. at 1039; see also, Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995); Cedars-Sinai Med. Ctr. v Wilkins, 11 F.3d 1573, 1581 (Fed. Cir. 1993); Western Oil & Gas Ass'n v. Sonoma County, 905 F.2d 1287, 1291 (9th Cir. 1990). As the Court explained:

> Judicial resolution of a legal question fit for judicial review yet portending no immediate hardship would constitute little more than a law review article. Conversely, to resolve an issue lacking factual development simply to avoid a threatened harm would be to favor expedition over just resolution. * * * Such is not to say that we may adjudicate only purely legal issues threatening extravagant injuries. Rather, the two prongs must play off each other. * * * Somewhere between Scylla and Charybdis lie cases appropriate to judicial resolution.

Nebraska Public Power District v. MidAmerican Energy Co., supra at 1039 [citations omitted].

With these precepts in mind, we turn to the issue of whether this case is "ripe" for judicial review.

B. Legal Analysis.

1. The EEOC's Motion to Dismiss. The EEOC contends that the agency action in this case lacks the finality necessary to render the case ripe for review, and that it does not present purely legal questions. In contrast, MSBAIT urges that they are questioning the EEOC's ability to actually hold an investigation, and not merely the final decision of the EEOC. Therefore, MSBAIT contends, under the authority of Middle South Energy, Inc. v. Arkansas Public Service Comm'n, 772 F.2d 404, 411 (8th Cir. 1985), this case should be heard by the Court.

In Middle South Energy, the Court was reviewing the propriety of an injunction, granted by the District Court, which prevented the Arkansas Public Service Commission ("APSC") from conducting further proceedings concerning a utility's contracts to purchase power from, or the payment for construction of, a nuclear power plant located in another state. Id. at 406. In arguing for the injunctive relief, Middle South Energy ("MSE") asserted that the proceedings before the APSC were preempted by the Federal Power Act, Title 16 U.S.C. §§824-824k. Id. at 409. In addressing the

issue of whether the case was ripe for review, since APSC claimed that there was no "'ripe' case or controversy" until it decided whether the contracts were valid, under Arkansas law, see, id. at 410, our Court of Appeals observed:

> MSE challenges not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding. It can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress.

Id. at 410-411.

Based upon this phrase, MSBAIT contends that it is challenging the authority of the EEOC to conduct the investigations, as well as the EEOC's determination that the Plans violate the ADEA and, therefore, the case is ripe for review. See, Plaintiffs' Response Brief in Opposition to Defendant United States Equal Employment Opportunity Commission's Motion to Dismiss, at 5.

We believe that the holding, in Middle South Energy, is inapposite here because, in that case, the Court was addressing an issue of preemption. Preemption operates to "spare a party from the very process." NE Hub Partners v. CNG Transmission Corp., 239 F.3d 333, 342 (3rd Cir. 2001). As the Court of Appeals for the Third Circuit has explained:

> [T]he issue here is ripe for adjudication. The proceedings before the [state agency] have been ongoing for nearly one year. The interest that [the appellant] seeks to vindicate in

> this proceedings is the right to be free from 'state laws * * * respecting the rates * * * of electric utilities' and from the expense, delay, and uncertainty inherent in the administration of such laws. If, as [the appellant] insists, the ongoing [state agency] proceedings constitute state regulation of utility rates and the burdens on [the appellant] occasioned by those proceedings are the kinds of burdens which Congress intended [qualified facilities] to be spared, Congress' mandate would be frustrated if [the appellant's] right to judicial review were postponed.

See, Freehold Cogeneration Assocs. v. Board of Regulatory Comm'n., 44 F.3d 1178, 1189 (3rd Cir. 1995); see also, NE Hub Partners v. CNG Transmission Corp., supra at 343; Sayles Hydro Assocs. v. Maughan, 985 F.2d 451, 454-54, 456 (9th Cir. 1993)("The hardship is the process itself," and the "[u]ndue process may impose cost and uncertainty sufficient to thwart the federal determination that a power project should proceed.").

We have found no instance, however, in which a Court has applied the Court's decision, in Middle South Energy, outside of the context of preemption.

Indeed, if we were to apply the holding, in Middle South Energy, as broadly as MSBAIT urges, any Federal Complaint, which alleges that a governmental agency is conducting investigations in accordance with an unconstitutional Statute, or in violation of a Statute, even though the agency's action had yet to have an effect on the plaintiff, would be ripe for an adjudication -- a result at odds with Supreme Court and Eighth Circuit authority. Under applicable authority, those who seek to "challenge the authority under which [governmental] proceedings would be brought," without

awaiting "the actual commencement of enforcement proceedings," must show that they have suffered "immediate coercive consequences" "for such an action to present a justiciable controversy." Caldwell v. Gurley Refining Co., 755 F.2d 645, 650 (8th Cir. 1985), citing Lake Carriers' Ass'n. v. MacMullan, 406 U.S. 498, 506 (1972), and Nuclear Engineering Co. v. Scott, 660 F.2d 241, 252 (7th Cir. 1981); see also, Babbitt v. United Farm Workers Nat'l Union, supra at 298.

While, in Middle South Energy, the Court could accurately reason that, "[i]t can hardly be doubted that a controversy sufficiently concrete for judicial review exists when the proceeding sought to be enjoined is already in progress," see, Middle South Energy v. Arkansas Public Service Comm'n., supra at 410-411, the same may not be said here. All that is in progress is, as yet, an academic dispute as to the applicability of the prohibitions, of the ADEA, to specific early retirement policies -- a dispute which may never reach fruition, let alone be finalized. Accordingly, we turn to consider whether MSBAIT has satisfied the "fitness," and "hardship" prongs, so as to render this action ripe for judicial review. See, Nebraska Public Power District v. MidAmerican Energy Co., supra at 1039.

Under the terms of the ADEA, the EEOC's administrative proceedings include both investigations and, when it appears that discrimination has occurred, "informal methods of conciliation, con-

ference and persuasion." Title 29 U.S.C. §626(a)-(b); 29 C.F.R. §§1626.4, 1626.15(b). In this case, the EEOC has attempted conciliation efforts, apparently with a number of the "Plan Participants," but conciliation has failed in most of those instances. Therefore, conceivably, the EEOC could institute litigation against the respective School Districts, or the individual, who filed the charge of discrimination, if the investigation had been triggered by a charge, could potentially sue the affected School District.

In any case, "[t]he Commission cannot adjudicate claims or impose administrative sanctions," as the "final responsibility for enforcement of Title VII is vested with the federal courts." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974). Moreover, any Court action, which should be filed by the EEOC, would be open to de novo consideration by the Federal Court, as the EEOC's findings are not binding upon those Courts. Id.; Georator v. EEOC, 592 F.2d 765, 767 (4th Cir. 1979); Hall v. United States, 436 F. Supp. 505, 509 (D. Minn. 1977). However, as of this date, the EEOC has instigated no legal action against any of these Plaintiffs. See, Affidavit of Monty Johnson, at ¶18.

Simply put, the EEOC's determination of reasonable cause does not, without more, satisfy the degree of finality necessary to be ripe for judicial review. See, Nebraska Public Power Dist. v. MidAmerican Energy Co., supra at 1038 ("In appeals from administra-

tive regulation, the fitness prong questions finality and exhaustion."). The only way the EEOC can enforce the ADEA -- other than through voluntary measures -- is through Court action. As other Courts have determined, for purposes of the Administrative Procedures Act, the actions taken by the EEOC, in processing charges of discrimination, are not final agency actions subject to judicial review. See, Mississippi Chem. Corp. v. EEOC, 786 F.2d 1013, 1019 (11th Cir. 1986)(determining that the issuance of a Commissioner's charge by the EEOC was not a "final agency action" under Administrative Procedure Act so that the validity of the charge alleging that an employer was engaging in pattern or practice of unlawful discrimination was not ripe for review); Ward v. EEOC, 719 F.2d 311, 313 (9th Cir. 1983); Stewart v. EEOC, 611 F.2d 679, 682-4 (7th Cir. 1979); Georator v. EEOC, supra at 767-8.

As the Court, in Georator, explained:

> No * * * finality exists with respect to the EEOC's determination of reasonable cause. Standing alone, it is lifeless, and can fix no obligation nor impose any liability on the plaintiff. It is merely preparatory to further proceedings. If and when the EEOC or the charging party files suit in district court, the issue of discrimination will come to life, and the plaintiff will have the opportunity to refute the charges.

Georator v. EEOC, supra at 768.

We agree. The actions of the EEOC, in issuing and investigating a charge, and in uttering a determination of reasonable cause, are

acts of lifelessness which lack finality. We are not unmindful of the uncertainty that has been engendered by the EEOC's investigations to date, nor are we insensitive to the Plaintiffs' expression of frustration, in the face of that uncertainty. The remedy, however, is not to cleanse the air of uncertainty that is created by the expression of an administrative view which lacks the enforceability of a law. The resources of the Federal Courts would be unnecessarily consumed, and, therefore, unavailing to address actual cases and controversies, if the resolution of wholly suppositional questions were allowed.[8] Thus, we conclude that this action is not now fit for judicial review, and is not ripe for adjudication.

Unlike the circumstances in Abbott Labs. v. Gardner, supra at 149, in which the Court concluded that a ripe controversy had been presented, since purely legal issues were at play, we can reach those issues only upon a final decision of the EEOC as to how it

[8]We do not overlook MSBAIT's implicit characterization, of the EEOC's acts, as analogous to the playground bully, who would exercise his superiority of strength, or resources, to ratchet a concession not lawfully allowable. Without crediting the accuracy of the characterization, we still believe that, even if correct, the answer lies in an available political process, and not in relegating such altercations to Court's of limited jurisdiction. We would add, however, that the issues being administratively considered do not lend themselves to a narrow, pinched analysis, as the viability of public education, as it is currently funded, may well lie in the balance, depending upon the EEOC's ultimate, final election -- an election that would be subject to Federal judicial review.

will elect to proceed. Should the EEOC pursue an enforcement action against the MSBAIT, or its member School Districts, the Court will surely be urged to consider whether Minnesota School Districts are "arms of the state," for Eleventh Amendment immunity purposes. MSBAIT certainly raises that contention in the allegations of its Second Amended Complaint, but the issue is not, necessarily, amenable to resolution as a matter of law. There is considerable authority that local School Districts are not, automatically, instrumentalities of the State, and do not enjoy Eleventh Amendment immunity from private lawsuits.

Determining whether the Minnesota School Districts are properly "arms of the state," raises fact questions, which may well not be suitable to a stipulated Record, or to disposition as a matter of law. In Mount Healthy City School Dist. Board of Edu. v. Doyle, 429 U.S. 274, 280 (1977), in which the Supreme Court determined that a School District was not a "arm of the state," the Court looked to a number of factors, including the following:

> 1. The legal characterization of the School District under State law;
>
> 2. The extent of guidance exercised by the State over School District operations;
>
> 3. The financial relationship between the State and the School District; and
>
> 4. The local board's powers, including the power to levy taxes.

Id. at 280-81; see also, Miener v. State of Missouri, 673 F.2d 969 (8th Cir. 1982)(deciding that the determination on whether a defendant may "partake of the state's eleventh amendment immunity depends, at least in part, on the nature of the entity created by state law," and concluding that Missouri Counties, as well as School Boards of the Counties, do not occupy the same position as a State for Eleventh Amendment purposes); EEOC v. Hickman Hills Consolidated School District No. 1, 99 F. Supp.2d 1070, 1080 (W.D. Mo. 2000)("The Eighth Circuit has ruled that school boards are not entitled to immunity provided by the Eleventh Amendment [citations omitted]," and "[i]t follows that a school district would also not be immune.").

The parties have cited a number of Federal cases, which hold that a School District either is, or is not, an "arm of the state" for Eleventh Amendment purposes. In addition, MSBAIT has pointed to Minnesota case law, which holds that School Districts are "arms of the states" for some purposes, but none of the cases considered the question under the Eleventh Amendment. See, Allen v. ISD No. 17, 216 N.W. 533 (1927); GME Consultants v. Oak Grove Dev., 515 N.W.2d 74, 76 (Minn.App. 1994). Absent a stipulated Record -- which has not been reached, and seems unreachable in this instance -- if the Court were obligated to determine that the School Districts' entitlement to Eleventh Amendment standing, as "arms of the state," we would be obliged to look closely to the factual Record presented.[9] Notably, however, whatever the resolution of the issues,

---

[9]We also note that the Local Unions, and their respective School Districts, bargain, and sign, their own, individual collective bargaining agreements. See, Affidavit of Larry E. Wicks, at ¶10. As a result, the clauses at are not necessarily uniform. In (continued...)

which are raised by the Second Amended Complaint, might ultimately entail, will be unknown, and unknowable, until such time as the EEOC, or a charging individual, should isolate a viable claim against MSBAIT, or any of its member School Districts. Thus, on this Record, MSBAIT has failed to satisfy the "fitness for judicial review" prong of the "ripeness" analysis.

Moreover, MSBAIT has failed to show that, without judicial review, either it, or its member School Districts, will suffer a "significant" harm. See, Nebraska Public Power Dist. v. Mid-American Energy Co., supra at 1039. Unlike the circumstances in Abbott Lab. v. Gardner, supra at 151-52, where a challenge to the FDA's drug labeling Regulation was ripe, prior to enforcement, because that Regulation had the immediate "status of law," and such violations of law carried "heavy criminal and civil sanctions,"

---

[9](...continued)
fact, according to the Unions, there are approximately 100 different types of clauses, which are employed by the various School Districts, and which may implicate the ADEA. Id. at ¶22. Since the Plaintiffs' request the Court to determine that the agreements of the Plan Participants do not violate the ADEA, if we do not decide that the ADEA is unconstitutional, or that the Plan Participants are entitled to Eleventh Amendment immunity, deciding this case would not involve the simple task of interpreting one agreement under the scrutiny of the ADEA. Rather, interpreting all of the Plan Participant agreements would constitute a significant undertaking, by both the parties, and the Court. Such a task should be deferred, in the absence of some other cogent showing, which here has not been made, until the EEOC decides how it wishes to proceed on its determinations of reasonable cause.

MSBAIT advances no such showing here. Absent an enforcement action, neither the EEOC, or any charging person, can require the School Districts to take any remedial action. See, Alexander v. Gardner-Denver Co., supra at 44. Instead, the EEOC can only attempt conciliatory efforts, which the School Districts can reject. Indeed, according to the parties, a number of the Plan Participants have rejected the EEOC's offer of conciliation without EEOC imposed sanctions. See, Affidavit of Monty Johnson, at 15. Consequently, this Record is bereft of any "immediate coercive consequences," see, Caldwell v. Gurley Refining Co., supra at 650, by the EEOC's investigations to date, or by its reasonable cause determinations.

While the Plaintiffs may later be subjected to the cost of litigating the issues, which are associated with any charges the EEOC may formally bring to Court, "'[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.'" See, FTC v. Standard Oil Co., 449 U.S. 232, 244 (1980), quoting Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24 (1974). "'[T]he expense and annoyance of litigation is 'part of the social burden of living under government.'''" Id., quoting Petroleum Exploration, Inc. v Public Service Comm'n, 304 U.S. 209, 222 (1938). Accordingly, we find no evidence to establish, that

withholding judicial review will cause the Plaintiffs significant harm.[10]

In sum, we find that this case is not fit for judicial review, and that the Plaintiffs will not suffer significant harm, were we to decide not to review the case. Therefore, we conclude that the Plaintiffs' claims do not present a ripe "case or controversy" and we recommend that the EEOC's Motion to Dismiss be granted.

2. The Unions' Motion to Dismiss. The questions presented by Unions' Motion to Dismiss need not long detain us. As with the EEOC, the Plaintiffs' claims against the Unions fail to present a ripe "case or controversy." The Unions have taken no action against the Plan Participants, and neither the Cloquet Local Union, nor Education Minnesota, have commenced litigation against either of the Plaintiffs, as to the relationship, if any, between retirement benefits and the ADEA, and they have never filed an administrative charge with the EEOC. As a result, there is no evidence to suggest, let alone establish, that a live "case or controversy" currently exists between these parties.

---

[10]The Plaintiffs also point to Minnesota Gas Co. v. Public Service Comm., 394 F. Supp. 327, 329 (D. Minn. 1974), in which the Court held that a justiciable controversy was presented when a new law alters, or concretely threatens to alter, a preexisting course of conduct. However, as the Plaintiffs readily admit, the provisions of the ADEA, which are the focus of the parties' negotiations, are not "new law."

In this respect, the case is similar to Microstrategy Inc. v. Convisser, 2000 WL 554264 (E.D. Va. May 2, 2000), in which an employer sued one of its employees, seeking a declaration that its previous actions concerning the employee did not violate the anti-retaliation provision of the Fair Labor Standards Act ("FLSA"), that the employee was entitled to no relief under the FLSA, and that the employer would not be guilty of retaliation, under the FLSA, were it to terminate that employee. Id. at *1. Even though the employee, in Microstrategy, had filed an administrative charge against her employer with the EEOC, and had threatened to sue that employer, alleging that the employer had violated her rights under Title VII and the ADEA, and had retaliated against her for exercising her statutory rights, the Court determined that there was no Article III, or Declaratory Judgment Act "case or controversy," presented. Id. at *3. In the words of the Court:

> In sum, the threatened lawsuit, with nothing more, is not sufficient to trigger jurisdiction under the Act. If it were, this court would be exercising jurisdiction merely to render advisory opinions. Jurisdiction is proper only where a court can provide "specific relief through a decree of a conclusive character."

Id.

Here, we find that the Plaintiffs have advanced even a weaker showing that their action is ripe, as to the Unions, than that mounted by the employer in Microstrategy.

The Unions have not filed any of the charges, which have led to the investigations, and reasonable cause determinations, that were filed by the EEOC. In actuality, the Local Unions have also been targeted by the EEOC. See, Affidavit of Monty Johnson, at ¶16 (advising that 121 directed charged were filed against Education Minnesota's Local Unions). On this Record, no "real, substantial controversy," between the Plaintiffs, and the Unions, has been shown. See, Babbitt v. United Farm Workers Nat'l Union, supra at 298.

According to the Plaintiffs, the retirement plans are a part of the collective bargaining agreements, and therefore, as a signatory to the ISD 94 agreement, the Cloquet Local Union should be joined as permissible party, under Rule 19(b), Federal Rules of Civil Procedure. See, e.g., Hodgson v. School Bd., New-Kensington-Arnold School Dist., 56 F.R.D. 393 (D. Pa. 1972); Morris v. Steele, 253 F. Supp. 769 (D. Mass. 1966). With regard to Education Minnesota -- which is not a signatory to the collective bargaining agreements, see, Affidavit of Larry E. Wicks, at ¶¶10-11 -- the Plaintiffs urge that it is so intimately involved with the collective bargaining process, and since Education Minnesota may defend those collective bargaining agreements, that it, too, is a necessary party. The argument, under Rule 19(b), however, is mooted by the fact that the underlying claim, that the Plaintiffs have

against the EEOC, is not ripe for adjudication, and is not rendered ripe by virtue of the joinder of the Unions, as permissible parties, or otherwise. Therefore, the Plaintiffs' action against the Unions should also be dismissed.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Plaintiffs' Motion for Partial Summary Judgment, and for Injunctive Relief [Docket No. 13], be denied as moot.

2. That the Defendant EEOC's Motion to Dismiss [Docket No. 22] be granted.

3. That the Defendant Unions' Motion to Dismiss [Docket No. 26] be granted.

Raymond L. Erickson
Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 31, 2001** a writing which specifically identifies those portions of the Report

to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 31, 2001**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.